IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SHERLYN KAY PLEDGER, | ) | |
| | ) | |
| Plaintiff, | ) | NO. CIV-05-1006-HE |
| | ) | |
| MERLE L. DIBLER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff Sherlyn Kay Pledger was driving east on I-40 on November 18, 2002, when her vehicle was rear-ended by a car driven by Merle Dibler. He was then struck from behind by a vehicle driven by Joy Coddington, an uninsured motorist. The plaintiff subsequently sued Dibler, Coddington and her insurer, State Farm Mutual Automobile Insurance Company ("State Farm"), in state court, asserting negligence claims against the two drivers and breach of contract, bad faith and intentional infliction of emotional distress claims against State Farm. After the state court bifurcated the plaintiff's claim against Dibler from her claims against State Farm, the insurer removed the action[1] and now seeks partial summary judgment on the plaintiff's breach of contract and bad faith claims.[2]

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."

---

[1] *As defendant Coddington had not been served, her citizenship was not considered for removal purposes.*

[2] *State Farm did not request summary judgment on the plaintiff's intentional infliction of emotional distress claim, although, on the facts presently before the court, it is doubtful whether the necessary intentional and outrageous conduct, coupled with severe emotional distress, is present here.*

Fed.R.Civ.P. 56(c). The evidence and any reasonable inferences that might be drawn from it are viewed in the light most favorable to the nonmoving party. Simms v. Okla. ex rel. Dep't of Mental Health and Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999). Having applied the Rule 56 standard to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," Jeffries v. Kansas, 147 F.3d 1220, 1228 (10th Cir.1998) (internal quotation and citation omitted), the court concludes a ruling on the defendant's motion should be deferred. The facts pertinent to resolution of the motion follow.

## BACKGROUND

After the dual impact car accident, the plaintiff was taken to a hospital. She underwent x-rays and a CT scan and was examined by a physician, who classified her injuries as minor. He diagnosed her with having a chest contusion and neck and back strain and released her from the hospital with a pain prescription and instructions to follow-up with her family physician within four days.

At the time of the collision, the plaintiff was insured by State Farm on two policies, which provided medical payments ("MP") coverage of $5,000, collision coverage and combined uninsured/underinsured motorists ("UM/UIM") coverage of $50,000. The day after the accident, the plaintiff reported it to State Farm and the claim was assigned to Rex Henck. He contacted the plaintiff on November 20, 2002, and took her recorded statement. He also arranged for the plaintiff's car to be appraised and requested a copy of the police report. By letter dated November 21, 2002, Henck, on behalf of State Farm, acknowledged

receipt of the plaintiff's claim, advised her that her UM coverage might apply if the other driver was not insured or underinsured, and informed her of the limits of her MP and UM coverage. She was instructed to contact Henck if she intended to pursue a UM claim under her policies.

An estimate for the damage to the plaintiff's car was prepared and sent along with payment to the plaintiff on November 22, 2002. Henck subsequently sent the plaintiff a copy of the police report on December 10, 2002, and told her that Maria Tullos with Hartford Insurance was handling the claim under Dibler's insurance policy. Henck told the plaintiff how to contact Tullos and what to tell her.[3] He also said he had a call into Tullos, as well.

State Farm subsequently received the plaintiff's medical records and learned she had been seen on November 26, 2002, for neck, back and leg pain. She received several adjustments in early December from a Dr. Miller and was prescribed pain medication and a muscle relaxer. Dr. Miller referred the plaintiff to physical therapy for treatment for two weeks and, after examining her again on December 11, 2002, recommended she see a physical therapist three times a week for one month. Medical records reflect the plaintiff was seen by a physical therapist on December 11, 16, 18, 20, 23 and 27. Dr. Miller reported on January 7, 2003, that the plaintiff's condition had improved 70% and released her. By early January, State Farm had paid $3,572.59 in medical bills on plaintiff's behalf.

At the end of December 2002, State Farm issued payment for repairs to the plaintiff's

---

[3]*Henck advised the plaintiff to state that she had been rear-ended by Dibler, wanted to make a claim for her injury, and that State Farm had paid all but the deductible on her vehicle.*

vehicle after it received a supplemental estimate from her body shop and, on January 9, 2003, the insurance company paid plaintiff $400.00, the maximum amount available under her policy for loss of use of her vehicle. In letters dated December 12, 2002, and January 9, 2003, Henck informed Tullos that her insured was responsible for the accident and demanded reimbursement for the cost of repairs to the plaintiff's vehicle, loss of use, and her deductible. Tullos informed Henck on January 13, 2003, that Hartford accepted 90% responsibility under Dibler's policy for the collision. She refused to disclose his policy limits, but said they would be "plenty" because he carried more than the minimum. Henck's attempts in January to contact Coddington, the third driver, were unsuccessful.[4] Hartford paid State Farm 90% of the plaintiff's property damage claim in January and, on January 23, State Farm reimbursed the plaintiff for her collision deductible.

The parties dispute the substance of conversations that occurred in February and March 2003, when State Farm contacted the plaintiff to determine the status of her treatment. State Farm asserts it informed the plaintiff that, under joint and several liability law, Hartford should be responsible for 100% of the plaintiff's damages, and that the plaintiff stated that she felt Dibler was 100% at fault. The plaintiff denies Henck informed her of the pertinent law and asserts that her position has always been that the two impacts (when her vehicle was hit by Dibler and then struck again when Coddington hit Dibler) were about the same. She claims Henck continued to tell her that Dibler was totally responsible for her injuries and that

---

[4]*Henck had written Coddington, advised her that she was liable for 10% of the damage to the plaintiff's vehicle and requested payment of that amount.*

she should seek to recover all her damages from Hartford.

By letter dated March 4, 2003, Henck demanded that Hartford pay the remaining amount of the plaintiff's property damage, as it was jointly and severally liable for the entire sum. Hartford responded on March 14, 2003, stating the accident was caused by two separate occurrences and that it had paid 100% of the damages caused by their insured.

Henck then agreed to try and expedite the plaintiff's claim with Hartford by forwarding her medical records and bills to Hartford for evaluation. He subsequently contacted Pledger on May 8, 2003, and she reported that she was experiencing continued pain in her shoulder and might need an MRI. "[He] determined [he] would continue to monitor her claim for possible underinsured motorist benefits based on possible insufficient coverage under Mr. Dibler's policy." Defendant's Exhibit 1, ¶19; Defendant's Undisputed Fact ¶ 27.

The plaintiff contacted Henck on August 1, 2003, and reported that Hartford had offered her $5,000 for her injuries, but that she had not settled her claim. By letter dated October 14, 2003, Henck requested the status of the plaintiff's injuries and, when she failed to respond, he sent a second letter on October 30 asking her to contact him to discuss her claim. The plaintiff called Henck on November 13, 2003, but the substance of their discussion is disputed. He asserts, but she denies, that she reported she was negotiating with Hartford. She contends that her "negotiations" consisted of her calling Hartford repeatedly and the company failing to return her calls. Henck sent the plaintiff a letter that date informing her she had exhausted her MP limits, telling her which bills State Farm and paid

and which were outstanding, and suggesting she submit her unpaid medical bills to her health insurance carrier. The plaintiff does not recall receiving that letter.

On January 15, 2004, Henck contacted the plaintiff and learned she believed her medical treatment was completed and that she would contact Hartford to make a demand under Dibler's policy. Ray Maples, an attorney hired by the plaintiff to represent her in conjunction with her claim, then sent Henck a letter dated Feb. 16, 2004, asking State Farm to evaluate the plaintiff's claim for uninsured motorist coverage and waive subrogation against Hartford. Henck forwarded the letter to Hartford, telling its representative that he could not respond to Maples' request without knowing Dibler's policy limits. He also sent the company a waiver of subrogation. On Feb. 16, 2004, Henck responded to Maples' letter, stating that because the plaintiff's medical treatment was completed, he would evaluate her claim and let Maples know if his evaluation was within Hartford's limits or if he would be "stepping down to dollar one on an insufficient limits basis." Defendant's Exhibit 33. By separate letter the same date, Henck sent Maples the plaintiff's medical records and bills, which Maples had requested, and asked Maples to inform him of any additional medical providers or bills.

Maples then informed State Farm by letter dated February 17, 2004, that the plaintiff did not know which impact caused her injuries and that Hartford had taken the position that it was not responsible for both impacts. He again requested that State Farm evaluate the claim and tender its policy limits. Henck responded on the 17th, stating that in his opinion the plaintiff's injuries were caused by Hartford's insured, but that he would evaluate the

plaintiff's uninsured motorist claim. Because Hartford indicated their limits were sufficient to handle the injuries caused by Dibler, Henck stated he would evaluate the injury caused by the uninsured motorist (Coddington). He inquired if the plaintiff was claiming lost income, noting that records listed her as unemployed when the accident occurred. On February 23, 2004, Henck left a message with Maples asking whether the plaintiff was seeking to recover lost wages, but Maples never responded.

Henck then wrote Hartford on March 2, 2004, informing the company that the plaintiff had demanded that State Farm "step down and pay [the] claim from dollar one" and that it was withdrawing its waiver of subrogation. Henck asked Hartford to acknowledge in writing that it had not settled with the plaintiff and understood that no waiver of subrogation applied to the claim, which Hartford did the next day.

Henck evaluated the plaintiff's UM/UIM claim on March 2, 2004, concluding its value ranged between $13,232 and $14,232. The total consisted of medical bills in the amount of $6,232.05 and noneconomic loss valued between $7,000 and $8,000. Three days later Henck offered Maples $14,000 to settle the claim and Maples asked Henck to forward him a draft for that amount, which Henck did. Maples then demanded that State Farm pay the remaining UM/UIM limits available under the plaintiff's policies. Henck contacted Maples and explained his evaluation, after which, on March 12, 2004, Maples questioned why State Farm did not evaluate the plaintiff's claim from dollar-one sooner and again demanded payment of the policies' limits. Henck's response, which the plaintiff disputes, is that he had proceeded on the assumption that Dibler was 100% at fault for the plaintiff's

7

injuries, based on her telling him during a phone conversation on February 14, 2003, that she felt Dibler was completely responsible. The plaintiff also disputes Henck's statement that State Farm decided to pay the claim under the plaintiff's UM coverage when it learned the plaintiff was unsure which impact caused her injuries. The plaintiff contends State Farm knew from the time of her recorded statement on November 20, 2002, that she was unsure which impact injured her. After receiving additional information about free medical treatment the plaintiff had received from her employer,[5] Henck wrote Maples on April 22, 2004, and, while he stated that State Farm believed she had been fairly compensated for her claim, offered $16,000 to settle it. The offer was rejected.

DISCUSSION

Bad Faith

State Farm seeks summary judgment on the plaintiff's bad faith claim, asserting a legitimate dispute exists as to the value of her claim under the insurance policies – whether her injuries exceeded the $14,000 that State Farm has already paid. The court concurs that the facts do not support a bad faith claim based on State Farm's evaluation of the plaintiff's damages.[6] However, the plaintiff's claim is not based just on the amount State Farm has

---

[5]*The total charge for the additional treatment was $440.00.*

[6]*The plaintiff's assertion that State Farm's bad faith is evidenced by its failure to augment its $14,000 payment after receiving information that the plaintiff had received additional medical treatment, amounting to $440, is not persuasive. State Farm's evaluation of the plaintiff's claim was not based solely on medical expenses, but included noneconomic losses valued between $7,000 and $8,000. The insurer could reasonably conclude that the payment that had already been made was adequate to compensate the plaintiff, or within the range of value assigned to the claim. The insurer's failure to pay the plaintiff the additional $2,000 it offered to settle the claim also does not,*

paid.[7] She also contends the insurer acted in bad faith by its handling of the claim, by its asserted delay in evaluating and paying it.

State Farm essentially argues that it proceeded under the assumption that there was no UM/UIM claim, as "Plaintiff repeatedly told State Farm that she believed Dibler was 100% responsible for her injuries," defendant's motion, p. 17, and Hartford assured Henck that Dibler's coverage was sufficient to satisfy the plaintiff's damages. The plaintiff has, though, denied making such a statement. Therefore, because State Farm promptly evaluated and paid the plaintiff's UM/UIM claim when asked to do so by her counsel and within two months after she had completed treatment for her injuries, the question becomes whether State Farm was legally obligated to evaluate and pay the plaintiff's claim <u>prior</u> to that date.[8] Both parties are directed to address this issue in supplemental briefs. State Farm also is directed to respond to the plaintiff's legal argument that once State Farm knew that Coddington and Dibler were joint tortfeasors and that Coddington was uninsured,[9] that "State

---

*under the circumstances, constitute evidence of bad faith. The evidence does not support the plaintiff's assertion that the $2,000 was "additional value" State Farm put on the claim following its receipt of the supplemental medical bills.*

   [7]*Indeed, it is less than clear whether the plaintiff's bad faith claim is even based on the sum paid by State Farm. See infra text 10-11.*

   [8]*The parties do not disagree about the applicable legal standard: "a claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient. The decisive question is whether the insurer had a 'good faith belief, <u>at the time its performance was requested</u>, that it had justifiable reason for withholding payment under the policy.'" </u>Buzzard v. Farmers Ins. Co., Inc.</u>, 824 P.2d 1105, 1109 (Okla. 1992) (quoting <u>Buzzard v. McDanel</u>,736 P.2d 157, 159 (Okla. 1987).*

   [9]*As the plaintiff has provided evidence to substantiate this statement, State Farm is directed to assume, for purposes of its response, that the statement is accurate.*

Farm stepped into the shoes of the uninsured motorist and was jointly and severally liable for all damages suffered by Pledger."[10]  Plaintiff's brief, p. 2. The plaintiff also needs to clarify when, in her view, the claim for UM/IUM benefits was made.[11]   *See generally* Buzzard v. Farmers Ins. Co., 824 P.2d 1105, 1109 (Okla. 1992) (insurer's conduct evaluated at time performance was requested).  A ruling on the plaintiff's bad faith claim will be deferred pending receipt of the supplemental briefs.

Breach of contract

It is unclear whether a factual dispute exists regarding the sufficiency of the amount paid by State Farm ($14,000) to satisfy the plaintiff's claim.  In her response brief the plaintiff does state, as noted by State Farm, that "Plaintiff does not maintain that the $14,000 that was paid her in March, 2004, was an unreasonable amount, she does argue it took way too long to receive those benefits."  Plaintiff's brief, p. 10.  In her supplemental brief the plaintiff is directed to clarify the basis for her breach of contract claim.   If it is based on the alleged delay in payment, then the validity of the plaintiff's contract claim will depend on when State Farm's obligation to pay the UM/UIM claim arose, which will be addressed by

---

[10]*Otherwise put, the plaintiff argues that "by mid-December, State Farm should have known that Pledger had a legitimate uninsured motorist claim and the State Farm was liable for 100% of her damages and could seek indemnification from the joint tortfeasor who was insured with Hartford." Plaintiff's brief, p.8.*

[11]*Although the plaintiff asserts that "State Farm never advised her that they were legally and contractually responsible for payment of her claim from dollar one," plaintiff's brief, pp. 2-3, Henck advised the plaintiff by letter dated November 21, 2002, that her UM coverage might apply if the other driver was not insured or underinsured, and informed her of the limits of her UM coverage.*

the parties in their supplemental briefs.[12]  If the claim is also based on the amount paid, the plaintiff is directed to provide some evidence substantiating her position that her injuries exceeded $14,000.

Accordingly, a ruling on the defendant's partial motion for summary judgment is deferred pending receipt of supplemental briefs from the parties.  The briefs, which shall not exceed **fifteen (15) pages** in length, shall be due on or before **January 20, 2006**.

**IT IS SO ORDERED**.

Dated this 11th day of January, 2006.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE

---

[12]*In its reply brief, State Farm asserts that "it is Defendant's contention that the duty of prompt payment is an action arising under an insurer's duty of good faith and fair dealing and not an action in contract." Defendant's reply, p. 5. In its supplemental brief State Farm is directed to provide some authority for this assertion.*